THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY
COMPANY

v.

JOHN TOUHY.

*Railroads—Personal Injuries—Fellow-Servants—Contributory Negli-
gence.*

1.   In an action brought by a switchman against a railroad company to
recover damages for a personal  injury received in the course of his employ-
ment, it is *held:*    That plaintiff and the engineer were fellow-servants; that
the negligence of the engineer was the proximate cause of the injury; that
the acts of the foreman, if negligent, did not render the defendant liable;
and that the weight of the evidence shows that the plaintiff was guilty of
contributory negligence.

2.   The fact that one of several servants, in the habit of working together
and in the same line of employment for a common master, has power to

control and direct the actions of the others with respect to such employment, will not render the master liable for his negligence resulting in an injury to one of the others, unless the negligence complained of arises out of and is the direct result of the exercise of such authority.

[Opinion filed February 14, 1888.]

APPEAL from the Circuit Court of Will County; the Hon. GEORGE W. STIPP, Judge, presiding.

Messrs. THOMAS F. WITHROW, JAMES C. HUTCHINS and SNAPP & SNAPP, for appellant.

Messrs. HALEY & O'DONNELL, for appellee.

BAKER, J. This is an action on the case, wherein John Touhy, appellee, recovered judgment in the Will Circuit Court against the Chicago, Rock Island and Pacific Railway Company, appellant, for $1,500 damages for personal injuries.

In 1885 the appellant company was possessed of certain switch yards at Grand Trunk Junction in Cook County, and the switch work of the company at said yard was done by a switch crew or gang, composed of said Touhy and Griggs, Popham, Dickerman and Huntsman; of these Dickerman was engineer, Huntsman was fireman and Popham and Touhy were switchmen or helpers. It is a matter of contention what is the proper title by which to designate Griggs; appellant insists he was head switchman, or foreman of the switch crew, while appellee urges he was yardmaster, or foreman of the yard. It would seem the mere title by which he is or was designated, is not very material. The evidence shows that William Dale was station agent of appellant at Grand Trunk Crossing; that when trains had to be made up in the yard the trainmaster gave him an order, and he gave the order to Griggs to execute, and the execution of the order was left to the latter; and that when cars came in from outside points they were accompanied by way-bills, and these came to the station agent, and that as the cars had to be transferred to various side tracks according to their several designations and

the particular road on which, and direction in which, they were to be transported, such agent made out switching lists and handed them to Griggs and the latter marked the cars in conformity with such lists, and used his own judgment in respect to what switch tracks to put the cars on, and how many to put on the respective tracks; and that Griggs superintended and directed the work of moving, switching and transferring the cars, and had charge of and command over the switching crew, but at the same time worked together with the other switchmen of the gang as a co-laborer in cutting, coupling and uncoupling cars, braking, opening and closing switches, and the other manual labor connected with the work.

At Grand Trunk Junction the railway of appellant runs nearly east and west, and is intersected by the Grand Trunk railroad, which runs at that point nearly north and south. There were three main tracks there and eight side tracks, and the transfer business between the two railroads was quite considerable. On the day in question some twenty-five box freight cars were standing on one of the side tracks, about seventeen or eighteen of which were south of a public road that crossed said side track, and the remainder were north of said road. The switch engine was ordered by Griggs to back upon this side track and get these cars. The engine had no cars attached to it when it went in on this switch track from the south, and it backed north and picked up one car which stood by itself, and then backed to couple on the others that were south of the road crossing. At the time of the transaction Popham was busy with some cars on the main line of appellant, and appellee was upon the right or engineer's side of the switch engine and train, and Griggs was upon the left or fireman's side. Touhy, the appellee, gave the signal to back to make the next coupling, which was duly obeyed, and immediately thereafter he went in between the car attached to the engine and the standing cars to make the coupling, but failed to do so. After the cars struck together they separated a short distance, and the evidence is conflicting whether Touhy remained between them, without showing himself to the en-

gineer, or came out and gave a signal and then returned to his place between the cars for the purpose of changing a link preparatory to making a second attempt to couple. At all events, the cars came together again, in response to a signal from Griggs, and Touhy's left hand was caught between the draw-bars, and so seriously crushed and injured that two of his fingers had to be amputated, and a third was rendered permanently stiff at the joint where it was broken. The matter at issue is, whether or not the appellant corporation is legally liable to respond in damages to Touhy, for the personal injuries thus received.

Touhy was on the engineer's side and signaled the engineer to back up and couple on to the next car, and the train backed and he went in between the cars to make the coupling, but missed making it. It is very plain from the testimony that it was then his duty to come out from between the cars on the engineer's side and signal the engineer either to "slack ahead," or to "stand still." It is manifest that if he did not do this, but remained between the cars, then he was guilty of such contributory negligence as would preclude a recovery. The engineer testified positively that Touhy neglected to perform this very necessary duty; he swears: "Touhy did not come out and show himself. I expected him to come out on the same side. I watched for him all the time. He did not give me a signal to slack up. I did not see any such signal. If he had given me a signal I would have seen it, because I was looking right at him. I was looking at the place Touhy went in all the time."

But Touhy swears that he stepped out from between the cars and gave the engineer a signal to slack ahead a little. If this be true then it was the engineer's bounden duty to have seen and obeyed the signal; knowing that Touhy had gone in to make the coupling it was required of him to watch closely his side of the train, to ascertain whether Touhy came out, and what signals he made; and the duty was also imposed on him not to back the engine until he either received a signal from Touhy, or saw that he was clear of the train. If Touhy made the signal to slack up and the engineer did not watch for

and see it, it was negligence in the engineer. And whether Touhy did or did not make the signal, in either event it was the duty of the engineer, he not having seen the signal if made, to refrain from backing his engine, even upon a signal so to do, without either he first knew that Touhy was out from between the cars, or else ascertained such signal was from Touhy. So, in either state of the case, it was culpable negligence in the engineer to back his train when he did, and his negligence in so doing caused the injury. The engineer was without question a fellow-servant of Touhy, and being such the latter can not recover against the common master for an injury caused by the negligence of his fellow-servant.

It does not help the matter that the engineer may have supposed the signal to back on which he acted came from Touhy, through the fireman on the left side of the engine. The overwhelming weight of the evidence is that Touhy had been in the frequent habit, after making a coupling, of jumping over the bumpers, between the cars, and coming out from the train on the other side from that on which he had gone in to make the coupling. The testimony of Dickerson, Griggs, Popham and Cruley to that effect is clear and positive, and three of them are men who worked with him on the same switching gang, and they are opposed only by his own uncorroborated statement to the contrary. That such crossing over to the other side of the train is contrary to the rules that appertain to railroading, and is negligence, is the uncontradicted testimony; and even without any evidence to that effect reason and common sense would indicate that such conduct was gross negligence. It is shown by the testimony of several of the witnesses that both the engineer and foreman had found fault with him for such practice. So, to this extent, the conduct of the engineer is palliated by the circumstance in question, and the fact he supposed Touhy had crossed over to the fireman's side of the train; fully to that extent the responsibility and negligence is shifted to the shoulders of Touhy himself.

The claim of negligence made by appellee is, that Griggs gave the signal to back the train; that Griggs was yardmaster or foreman of the yard and the representative of the railroad

company, and it was negligence in him to give the signal to back without first knowing Touhy had made the coupling and was clear of the cars, and that his negligence in so doing was the negligence of the company he represented.

Griggs had charge and control of the switch crew at the yard and authority over them, and they were subject to his commands. At the same time he worked along with the rest of the switch crew in the same line of employment and as a co-laborer. According to the doctrine announced in C. & A. R. R. Co. v. May, 108 Ill. 288, it would seem Griggs occupied a dual position in respect to the switch crew; in the one capacity he was the representative of the master, and in the other capacity a fellow-servant. In that case the Supreme Court said: "The mere fact that one of a number of servants who are in the habit of working together in the same line of employment, for a common master, has power to control and direct the actions of the others with respect to such employment, will not, by itself, render the master liable for the negligence of the governing servant resulting in an injury to one of the others without regard to other circumstances. On the other hand, the mere fact that the servant exercising such authority sometimes, or generally, labors with the others as a common hand, will not, of itself, exonerate the master from liability for the former's negligence in the exercise of his authority over the others. If the negligence complained of consists of some act done or omitted by one having such authority, which relates to his duties as a co-laborer with those under his control, and which might just as readily have happened with one of them having no such authority, the common master will not be liable. But when the negligent act complained of arises out of and is the direct result of the exercise of the authority conferred upon him by the master over his co-laborers, the master will be liable."

The difficulty of the rule seems to be in its application to determine in each particular case in which capacity the servant having the authority is acting. Here the contention of appellant is that Griggs, in giving the signal in question, was acting merely as a switchman and one of the gang of workmen in

the same line of employment, and that the act done by him related only to his duty as a co-laborer with those under his control. The evidence shows, however, that no one but the foreman of the switch crew or switch yard, as the proper title may be, had right or authority, under the rules of the railroad company, to order or direct the public road to be blocked; that it necessarily would be blocked in coupling onto the cars that stood on the switch track north of the road crossing; and the contention of appellee is that the signal given was an exercise of the authority conferred upon Griggs by appellant to govern and direct the movements of the men under his charge and control, and in law a command of the company.

Whatever may be the correct conclusion with reference to the capacity in which Griggs was acting, we have serious doubts of the propriety of the finding of the jury that he was guilty of culpable negligence in giving the signal to back the switch engine and train, and, in fact, the jury erred in so finding. He knew that Touhy was to make the coupling south of the public road, and hastened to the public highway for the purpose of being on hand to signal the engineer if the road was clear and couple the cars north of the crossing; he was on the fireman's side of the engine, train and intervening cars, and of course could not see Touhy, who was on the engineer's side, but he heard the switch train strike the standing cars and more than ample time had elapsed in which to make the coupling. He was warranted in assuming that Touhy and the engineer, both of whom were old and experienced railroad men, would discharge their respective duties. He did not know the former had succeeded in making the coupling, but he did know that, if he had not, then it was his duty to step out from the cars on the engineer's side of the train and signal the engineer either to "slack ahead" or "stand still;" and he also knew it was the engineer's duty to keep close watch for such signal and see it if given, and if given to obey it, and then not to back up again without he either received a signal known to be from Touhy or saw that the latter was clear of the cars. He could not reasonably have contemplated that the engineer, upon receiving his signal to back

up and block the crossing and couple on to the cars north of the highway, would forthwith obey such signal notwithstanding the fact he knew Touhy had gone between the intervening cars to make a coupling, and, so far as known, was still there, and would almost necessarily be either injured or killed by such immediate response to the signal. The signal from the standpoint of Griggs was not either recklessness or negligence, but from the standpoint the engineer occupied it was so manifestly unreasonable and dangerous to life and limb, if at once responded to, that he was under no obligation so to respond to it.

The engineer did not respond to the signal for the reason it was a command of his superior which he was required to obey, for the uncontradicted evidence is that he neither knew nor inquired from whom it proceeded. There is no plausible ground upon which it can justly be regarded as coming from Griggs as a representative of the master instead of from him as a fellow-servant of appellee, except the one circumstance that Griggs only, and he in his capacity of yardmaster or foreman of the switch gang, had authority to close the highway crossing or order it closed. Otherwise than as thus indicated the signal given might well have been given by any other switchman of the switch gang. Griggs was on the fireman's side of the engine and train, and knew Touhy was on the engineer's side and out of his sight, and was also aware Touhy had gone in to make the coupling and that it was impossible for him, Griggs, to certainly know whether or not Touhy had succeeded in so doing; and both Touhy and the engineer knew on which side Griggs was, and they both were fully advised Griggs could not possibly have knowledge of the safety of Touhy, without the latter, in disregard of his duty and the rule that governs railroading in that regard, had jumped over the bumpers and between the cars after making his coupling and was on the fireman's side and free of the train. The only thing the signal, fairly considered, indicated, was that the public road was clear of teams and the crossing could be blocked; and it was not contemplated by any one a signal from the foreman had any reference to Touhy.

It is plain that the signal made by Griggs, even if made by virtue of his authority as yardmaster or foreman, and known by the engineer to emanate from him, was not a peremptory order and command of the company itself forthwith and at all hazards to back up and close the public road crossing, nor could it, in the nature of things and in view of the situation, be reasonably regarded either by Griggs himself or by the engineer as such peremptory command and demanding immediate obedience. A discretionary power was, from the very necessity of the case, lodged in the engineer, and his duty both to his fellow-servant and their common master, required of him, not immediate and reckless obedience regard'ess of consequences, but a reasonable and cautious exercise of this discretionary power.

Assuming that Griggs, the foreman, was guilty of negligence, though we fail to find that he was, and that such negligence was the negligence of the company, yet it was not the proximate cause of the injury, but such proximate cause was the negligence of the engineer in at once responding to the signal reported by the fireman without first ascertaining whether or not it came from Touhy, or else that the latter was clear of the cars. The independent voluntary act of the engineer intervened and broke the casual connection between the signal and the injury. In such case the law is that if the negligence of the fellow-servant occasioned the injury, then there is no cause of action. We think, from the evidence that without doubt the negligence of the engineer does appear in this case and that it was the cause of the injury. As throwing some little light on this litigation, we refer to C. & A. R. Co. v. Keefe, 47 Ill. 108.

We have not placed our decision upon the ground Touhy himself was guilty of negligence, upon his failure to effect the coupling, in not stepping out from between the cars and signaling the engineer. If the evidence of the engineer is true, Touhy was undoubtedly guilty of gross negligence in that regard. But the testimony of Touhy himself was in contradiction of the engineer, and it was for the jury to determine in respect to the credibility of these two witnesses; and we

would hardly be justified in overruling their decision upon this point. We may incidentally add, however, to that which we have said in deciding the case, that in our opinion the weight of the evidence is that appellee was personally guilty of negligence in the premises, both in respect to that matter and in respect to his persistent habit, after effecting a coupling, of jumping across the train, between the cars, to the opposite side of the train from that on which he went in between the cars.

Our conclusion is, that the judgment is erroneous upon the facts as shown by the record, and that the appellee has no legal right of action against appellant; and the judgment is therefore reversed.

*Judgment reversed.*